The next case for argument is 24-1280 SurgeTech v. Uber. Mr. Bollinger, good morning. Please proceed. Good morning and may it please the Court. My name is James Bollinger and I'm counsel for SurgeTech in this case. It involves a patent, a group of patents in district court that were found to be invalid on eligibility grounds and all invalidated on Rule 12c. The patents include claims and an advanced computer network that involves an architecture for managing online bookings for transportation services. It provides an inventive interface layer that sits between vendors of online transportation services and a group of what's called distribution channels. It is, in fact, an intelligence layer because of the programming logic that is embedded in it that allows for the management functions that the layer provides. Claim convention is not, however, a computer implemented abstract idea. The technical improvement here is revealed by comparing Well, a computer is central to what you call as the architecture. Exactly, yes. A computer and you do have a computer. Yes. And, in fact, a specially programmed computer to manage the interactions between the two networks that it's involved in communicating to the vendors on one side and the distribution channels. It's a generic computer. It is a computer that has a capability that is not itself part of any invention here. So I'm not sure if it was a generic computer. It was a computer that existed at the time.  Just to be clear, it's just a regular computer. Well, it had special IO interfaces and it also included a relational database that allowed for real-time communications between the various parties that were involved in the transactions that this computer manages. But just to continue on that point. Sure. What you just said is basically true of all of the computer-assisted, network-assisted cases that we have repeatedly found in the absence of anything else. All computers are specially programmed. Lots and lots of them have relational databases like Excel, which I think the patent here refers to. I didn't see anything in the claims that say, here is some new kind of internal functioning of the computer that's something other than something off-the-shelf computers can be programmed to do, including what appears on a screen and keep a relational database, keep a record of how many sales are coming from Connecticut and how many are coming from Texas, and figure out, boy, it looks like Texas. One goes up like this and the Connecticut goes down like this. So put more of the product into Texas. That's what this patent is about, right? This patent is about that, but it's also about the magic that the programming does provide to the various elements in the computer network. And it allows for communications at real-time network speeds and responses to those communications in real time also. And that turns out to be critical in this case, and that's why while I don't think that there are any specialized components, there's a number of this Court's decisions that recognize that the invention resided in the software and the manipulation of those standard off-the-shelf components. And I'm not sure that that really properly describes the components here under a Rule 12 notion that existed in 2007. So remember in 2007, Netflix was still delivering DVDs by mail. The iPhone had just been released. This is an appreciable time in the world, certainly in networks and network design, and there's a number of cases since then where this Court has recognized distributed networks and monitors and things like that that are in those networks. I'm not sure that that may be true, but the principle or the doctrine of supply and demand, that's been around for ages. More than ages. And in fact, that was one of my points that I wanted to raise today, and I'm glad you asked it because we disagree with the notion that supply and demand is an abstract idea. The principle of supply and demand, it stems from Adam Smith's work in The Wealth of Nations from 1776. It is probably the most important economic principle. It stands there next to gravity and maybe even perhaps relativity to suggest that... And you're not claiming a principle, right? We're not claiming anything to do with the principle, but we do, just like your invention, that's what it's directed to. You're not claiming that, but the invention's directed to supply and demand. It is not directed to supply and demand. It is directed to managing online bookings by tracking what's happening in individual distribution channels. And whatever happens to those individual distribution channels, whatever forces are at play there, this picks up and then adjusts pricing and adjusts inventory based on those changes. Now, it could be one of those distribution channels... It seems to me you've just described what supply and demand is about. I disagree with that. I will say it's supply and demand forces are at play whenever there's a free market at the end of that distribution channel and they're selling and buying and transacting these transportation services. There's no question about that. But what if there's a denial of service at one of those distribution channels? If there's a denial of service at that distribution channel, it shuts down. Inventory is moved to other channels immediately. Is that supply and demand? No. That has nothing to do with supply and demand. That is an artificial event that this system compensated for, and therefore it's relying on... So I look at other technologies. Crystal growth relies on gravity. You do crystal growth in a gravitational field. Are you relying on gravity so that the crystals grow a certain way? But they're not in any way directed to gravity. That's not part of it. My point here is that because of the breadth of the alleged abstract idea, it's impossible unless you are doing like Morse's claim, communicate by electromagnetic means, by any electromagnetic means. That's not here. In fact, it's so attenuated from supply and demand, other events play a huge role in how the sales data is collected and processed afterwards. And so my thought on that is the one point I wanted to make is that these techniques that are part of this claim are technological in nature, and the way we know that is because what was done before was essentially useless. They had no interface to the distribution channels that was effective. The only evidence on this is the patent itself, and it describes them as being practically impossible to manage based on ad hoc rules. That's it. That's all we know about how vendors, and they talk about hotels and short-term accommodations as being the principal example, would move inventory into the marketplace. Who knows how they did it? It was probably email or by telephone in 2007, blocks of time. It looks like to me that the way this patent talks about hotels, big blocks that locked in, but it couldn't do them. It couldn't make adjustments to price. At least there's no evidence that they did that. They had no ability to, the record doesn't show any ability in the prior art, to manipulate inventories within individual channels, and there's no ability to actually accumulate information about what your competitors are doing and using that aggregated data and deciding what to do with your pricing. And the fact is that the system does that. It does receive composite information from multiple channels on how things are working in each channel for a number of vendors. No way they had any ability to do that before, and that's a powerful, robust data stream that now is controlling how those vendors' inventory is being moved into the distribution channel. So using, and I appreciate that it seems like the idea here is that... Why don't you address all this in Step 2? Yeah, let me just do one thing and then I'll go right to Step 2. All right. The one thing on Step 1 I wanted to address is two things, really. The first is that the benefits I talked about, it can detect surges. In distribution channels, which could never have been done before and is incredibly powerful as Uber demonstrates every day. It can also be scaled to hundreds if not thousands of distribution channels, which was impossible before. And while the district court judge recognized that, the district court concluded, but it's not in the claims. But the reality is, is this court has a number of times identified benefits from computer software that wasn't in the claims yet led to eligibility. And the one I point out is the Amdocs case, as an example. There's several others, the SRI case and others that did the same thing. Now, let me, we do have claim construction concerns. We think that the district court made some mistakes and didn't apply the claim construction as we proposed. And I've more than been able to answer questions about real-time how important it is here. And there's been some recent cases, the cooperative case by this court, suggesting that in certain circumstances, real-time processing not only is important, it's critical for what's being attended to. And the other one is the distribution channel. And then the last one is means plus function claims, where the district court dismissed them as more broad than the generalized statements that were in the claims. I wanted to clarify one thing. The parties had resolved their dispute as it related to the scope of those claims. The only thing left on means plus function that was debated is whether they were indefinite. So that's why they were withdrawn from the claims construction debate. They aren't withdrawn from eligibility, as the defendants have suggested. On step two, we're obviously arguing, there's a number of points we could make, but in time, I would point out that in step two, everything in step one, all those capabilities I think are critical, but more importantly, is the ordered combination. And their arguments, they have the burden of proof. And in 2007, there's no indication they're able to satisfy that burden of proof with what they contend are these generic terms that are used in the patent describing systems that have existed, and combination systems. On the idea of an ordered combination, their response is basically, it's logical. And with that, I'll reserve the rest of my time, unless you have any questions. Thank you. Thank you. Good morning. May it please the Court, Mark Ryder for Uber Technologies. There's a lot to respond to there, but I think that this case really boils down to very, very simple principles. One, I heard counsel at the beginning say that this was not an abstract idea just implemented on a computer. It is. It was. Your Honors asked about whether there was anything in the patent or whether these were generic computers. And if we look at the 598 patent, Appendix 52, what is the definition of computer that's in the patent? Any apparatus capable of carrying out data processing functions. It includes computer systems, smart phones, tablets, other handheld devices. A server is another aspect that allows the main computer in Figure 1 to be connected to the Internet or to the other computers. That doesn't answer the question, however, does it, about whether there's some technological improvement? I think it does, Your Honor, with respect. Because there's nothing in the patent, there's nothing in the specification that says these are special computers, that there is any advancement in these computers that are used in a different way. For example, we heard about Amdocs just a moment ago. Amdocs, the claim had an enhancement in it. There's nothing in the claims here that talks about a computer with any kind of enhancement or any kind of technological difference other than using the definition that is in the specification. And with respect to server, it's even broader. Any other data processing apparatus. When you're talking about generic computing systems that were available in 2007 with nothing in the specification that says that these are in any way special, in any way program special, or do anything special. And when you talk about the databases that are stored in these generic computers, they're just generic databases, relational databases. And the specification goes on to say, well, we can look at Excel, for example, at Appendix 38. Again, looking at the 598 patent. So when we talk about whether or not there's anything, and I know I've kind of skipped to Step 2, but when we talk about whether there's anything really unique or technologically different here, there is not. And we can just look at the specification. We can just look at the intrinsic evidence, and we see that. When we talk about going back to Step 1, is this about an abstract idea? Is this about supply and demand? Well, we can look at the 999 patent at Appendix 71, the second paragraph of the first column. It will be appreciated that the efficient selection of channels for such inventory can allow vendors to achieve a selling price that corresponds with demand for the inventory. In this way, an optimum price and supply of the inventory in each channel is achieved. It's about supply and demand. It says that right in the background of the invention. And we go to the prosecution history, Appendix 691, and when we look at the parent application and the applicants at that point, we're trying to overcome a reference called Lehman that the examiner had identified. What the applicant said is this principle is in contrast, the principle being the prior art, is in contrast to the presently claimed subject matter, which adjusts the price or adjusts the number of allocations to an extent that is dependent on comparison between certain sales characteristics or parameters. In other words, the applicant says, the adjustment is governed largely by supply and demand. This patent is all about supply and demand. It's all about doing it on generic equipment. And we can take it and look at it in a different way as well. It's also about data collection. We talked about this in our briefs, is that you can look at this in one of two ways. We have the abstract idea, the fundamental economic principle of supply and demand, implemented in a very logical way. Or we can also look at data collection. And we see that in their opening brief at page 6. They talk about aggregating data, analyzing that data, and spitting new data out. No different than what was seen in Parker v. Fluke, for example, in the Supreme Court years ago, and what we see in Trinity, and we see in Electric Power. It's taking data, collecting data, doing some algorithm on that data, and then spitting new data out. And we didn't hear anything about Perthrin and Syndicator. We heard a little bit about how the system purportedly can adjust for things, but the claims don't tell us how. And the district court was correct to point that out. There's no definition of performance indicator that tells us how. And, in fact, what's really interesting about this, because that is, I think, what Search Tech has said both below and here, that the performance indicator lets this detection and this adjustment happen. The definition of performance indicator below was indicator of performance. That was it. So, and then... What about the means plus function claims? So, first, on claim construction, we believe there was a forfeiture. At the district court, there was never any argument that claim construction mattered. At the very beginning of their brief, they say claim construction should occur. But they don't point out any specific term, and particularly the means plus function terms, as you said, Judge Taranto. Nothing about that matters. So there was a forfeiture below. And here, they... Didn't the court adopt? Now, I'm just messing this up with another case. I thought the court ultimately adopted their claim construction. The court, yes. The court said that they're... Judge Williams in Delaware said, I've looked at their construction, and it doesn't matter. It doesn't help them. At appendix 15, footnote 5, he does say, looking at their construction, for example, of distribution channel, it's even broader than Uber's construction. So what he said is, I've looked at it, and he had the benefit, unlike many other cases that are ruled on 12C, he had the benefit of all the claim construction briefing. In hours and hours, we took many hours of claim construction argument. He took all of that, and he said, they haven't shown me anything that makes a difference. I've looked at their construction, and it doesn't help them. So whether or not, Your Honor, he actually adopted it, he took it into account, he recognized it, and he said, they haven't told me how it is. Well, how would you answer Judge Taranto's question about means plus function? Okay. Well, I thought I had answered it, but if not, I apologize, is that they didn't, in the same respect, they didn't raise it below, and they haven't identified how it makes a difference. And if we look at examples, for example, the performance indicator, again, I was using that. Their definition of performance indicator on the means for determining a performance indicator was literally, well, virtually the entire patent. We look at Appendix 646 and 647, which is where they have their construction of the means for determining a performance indicator, and that was columns 3, 4, 5, 6, 7, 8, 9 to 10, 13, 14, many of the tables, and almost all of the figures, and as the district court explained, and then they tacked on at the end an equivalence thereof. So they didn't identify anything specific in the means terms. We look at the Accenture case, for example, and look at the means terms here, the means claims. We have Claim 1 of the 598 patent. It talks about all very functional language, linking and allocating and so on and so forth, and the only thing that we see in Claim 21, which has a means, this is means for allocating, means for linking. There's no difference here, and so what this court has said in Accenture is the eligibility issue doesn't turn on how one drafts the claims. One has to look at what the claims actually say. One has to look at what's incorporated within those claims, and the means plus function terms here don't help search tech because they haven't identified neither at the district court nor to this court where in those terms they make a difference. We heard a little bit about just to see if I'm thinking along the right lines. On the one that you spoke about, the performance indicator, with the extremely extensive reference to the spec, the right 101 inquiry would be that it's obviously not the case that the means is a combination of everything that's in that spec that in fact covers multiple individual things that are in the spec, and as long as some of that is itself abstract, then the claim fails. I think I understand your question. You said that the claim construction position on that particular means referred to, I don't know, a dozen or 13 different columns. Yes. Consecutive, there's a break in there. And suppose all of that said, suppose those 12 columns said you have to do this and this and this and this, and it went on for a very, very long time. Then there would be a single means. Now, that might start to get very concrete, which would help them on their 101 position. It might, but it doesn't here. Because it's not written as do this and this and this and this. It says do this or this or this. You can do this. You can do these other things. And as long as in that group is something, standalone something that is abstract, then the claim covers, even that means false function claim, covers something abstract. Correct. Yes. Right. Yes. That's actually absolutely right. And I pointed to the performance indicator, the means for, because as I said, the non-means construction for performance indicator was indicator of performance. And what they've done with the means for is just taken everything, just like their non-means construction was, indicator of performance. It's an abstract concept of trying to identify some way of measuring performance. And there is nothing in the claim, whether we look at it from means plus function format or we look at it in a non-means plus function format, that tells one of skill in the art how do they measure that. And they've pointed to in their brief some formulas. Those formulas in themselves are abstract. And we know from many cases of this court that just doing math or from the Supreme Court, just doing math on generic machines in an abstract way doesn't save the claims. But the math that they want to do is how many products are sold over a period of time versus how many products are totally available. That's supply and demand. That's how is these selling here based on the supply I have and the price that I provided. And we go to OIP. And it's the same thing. If we compare the claims of OIP to the claims here, which is what the district court did correctly, OIP found that optimizing price was an abstract idea. And the way in which that was done on the claims was send out a price, get some data back, run some statistics, send out a new price. Same thing happens here. Send the inventory out. See how people are buying it or not. Make an adjustment. Reprice or reallocate. And there's nothing that tells winning skill in the art how to do that. And that's critical both in the means context as well as the non-means context. So at the end, what we have here is we can look at this either as an abstract idea in the context of a fundamental economic principle in supply and demand, or we can look at this as an abstract idea in simply managing data. We send data out. We do some unknown algorithm on that data. We send data out again. Abstract idea under Trinity electric power. And we do all of this on generic computers with nothing disclosed that says there's any technological innovation here. And, in fact, page 3 of their opening brief, they talk about it just being a business problem. And I'm not suggesting that all business methods, Supreme Court has said in Bilski, that they're not per se ineligible. But here, there is nothing that takes them out of the realm of ineligibility. Thank you. Thank you. Judge Jonathan, I just wanted to respond on the 112.6 means for the performance. They did agree that it was the same function. The specification can only narrow that because it's the examples in the specification, the details that actually. And in this case, while there were, I think it was 19 or 20 citations to a 40-column specification, to a whole string, 12 tables, five different examples, that means for performance was the same in each one of those examples, even though it was cited in the claim construction briefs over and over again, it was the same concept. And, therefore, it was a narrowed version. There are only two equations in the entire specification for how to do the performance rating. In addition. It's pretty simple, isn't it? It is. There's no question about it. We're getting lots and lots of demand in Dallas. But that's why it's not the point of, it's not monopolizing the supply and demand principle. Two things on that I wanted to mention. The first is they keep saying a fundamental economic principle. Dozens of decisions by the courts. Fundamental economic principle. There's no decisions. We've looked. The decisions on the one, the most famous part of Bilski on hedging, it's called a fundamental economic practice. It's a much narrower concept than supply and demand. And they've used supply and demand and coupled it with other things recognizing the problem. They coupled the managing supply and demand. We don't manage supply and demand. It's like the deer molding operation doesn't manage the Arrhenius equation. It manages a mold. We manage online bookings across distribution channels. So I think that was wrong. The Excel is a, you can't use Excel to do these types of things. Excel is a presentation graphics spreadsheet. And it was used to make the tables that were used in the specification so that we could explain the concepts. There's nothing wrong with that. And that shouldn't tie or suggest that this is something much simpler than it is. It requires real-time processing to accomplish the things that we're trying to accomplish. And I appreciate your patience and thank you for your time. We think both sides of the case have submitted. That concludes our proceedings.